UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                                        Plaintiff,

                                                            22-cv-1346 (PKC)

                                                        OPINION AND ORDER

               -against-

JAMES VELISSARIS,

                                        Defendant.

------------------------------------------------------------------x

CASTEL, Senior District Judge:

          Pending before this Court is a civil enforcement action brought by the Securities

and Exchange Commission ("SEC") against James Velissaris, the founder, indirect majority

owner, former chief executive officer ("CEO") and former chief investment officer ("CIO") of

Infinity Q Capital Management LLC ("Infinity Q"), a registered investment adviser. A parallel

criminal proceeding resulted in Velissaris's conviction based on a guilty plea. The SEC now

seeks summary judgment on all claims asserted against Velissaris, each of which relies upon a

different provision or rule of the securities laws. As support, the SEC relies on his criminal

conviction and sworn admissions in support of his guilty plea, together with a limited number of

documents, including SEC filings.

          Velissaris argues that the SEC has failed to meet the standards for issue

preclusion, that he is innocent of the charge of which he was convicted, that his conviction is

tainted by Sixth Amendment violations and that he committed none of the securities violations

alleged by the SEC.

For reasons that will be explained, the motion will be granted in part and denied in part.

THE SEC'S COMPLAINT

The SEC alleges that Velissaris knowingly inflated by more than $1 billion the valuation of assets held by the Infinity Q Diversified Alpha Fund mutual fund (the "Mutual Fund"), and a hedge fund, the Infinity Q Volatility Alpha Fund, L.P. (the "Private Fund") (collectively, the "Funds") that Infinity Q advised during the period February 2017 to February 2021. While the SEC's complaint alleges seventeen separate claims, it characterizes them as related to one cohesive scheme. It asserts that Velissaris's actions violated several provisions of the securities laws: section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; sections 206(1), 206(2), 206(4) and 207 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4), 80b-7, and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8; and sections 34(b) and 37 of the Investment Company Act of 1940 ("Investment Company Act"), 15 U.S.C. §§ 80a-33(b), 80a-36. (Complaint ¶ 13(a).)[1]

Velissaris was initially represented by counsel in the SEC enforcement action but is presently proceeding pro se and is thus entitled to special solicitude. Velissaris was provided with the notice for an unrepresented person outlining summary judgment procedures required by Local Civil Rule 56.2. (ECF 40 & 41.)

---

[1] As an alternative to a direct violation of section 10(b), the Complaint alternatively alleges liability as a control person under section 20(a) of the Exchange Act, 15 U.S.C § 78t(a). (Complaint ¶ 13(b).)

## VELISSARIS'S PLEA ALLOCATION AND CONVICTION

Separately, Velissaris was indicted by a grand jury sitting in this district of six counts of securities fraud, investment adviser fraud, wire fraud, making false statements to an accountant, and obstruction of justice. United States v. Velissaris, 22-cr-105 (DLC). (ECF 39-1.) Count One of the Indictment charged in 43 paragraphs a scheme to defraud, practices and courses of business which operated as a fraud and the making of untrue statements of material fact and specifically alleged that Velissaris "made fraudulent misrepresentations to others, including investors in the Investment Funds, concerning the process by which the Investment Funds' OTC [over-the-counter] derivative positions were marked at fair value, and [Velissaris] mismarked the value of OTC derivative positions held by the Investment [F]unds in order to fraudulently inflate their value." (ECF 39-1 at ¶ 43.)

Shortly before the scheduled trial, Velissaris entered a plea of guilty to a single count of securities fraud that asserted violations of section 10(b) and Rule 10b-5 in satisfaction of all open counts. Velissaris was placed under oath at the plea proceeding and his statement encompassed the essential elements of the crime charged in Count One of the Indictment:

> Between 2018 and February 2021, . . . I made false statements of material fact to investors in the Infinity Q funds that I managed, and I did so knowingly, willfully, and with the intent to defraud. Specifically, I told investors that I was using an independent Bloomberg system to value the fund's over-the-counter derivatives. However, I was making manual adjustments in the system which increased the values of over-the-counter derivative positions that were reported. I knew that if I disclosed what I was doing, investors might have decided to redeem their investments or maybe would not have made the investments in the first place. Some of the communications with investors occurred over the phone and by email in the Southern District of New York. I acknowledge that my actions caused investors to lose money, and for this I am truly sorry.

(ECF 39-4 at 13.) In response to follow up questions by the judge presiding, he admitted that the purpose of the "manual adjustments" was to "increase the value of the securities being held by

3

the fund" and that his actions affected both the Mutual Fund and the Private Fund.  (Id. at 14.)

The judge also asked whether "the scheme that you employed . . . affect[ed] trades in the mutual

fund" to which he responded "Yes, it affected both funds, your Honor."  (Id.)

Fourteen days before the scheduled sentencing, Velissaris moved to withdraw his

guilty plea.  He endeavored to cast a benign interpretation on his statement at the plea allocution

that the purpose of the adjustments was to "increase the value of the securities," arguing that

investors knew that he could make corrective adjustments to valuations and that is all he did.  On

April 7, 2023, Judge Cote denied the motion from the bench and proceeded with the sentencing

that day.  He was sentenced principally to 180 months imprisonment with forfeiture in the

amount of $22 million and restitution, later set after further submissions, at nearly $126 million.

(ECF 39-8.)

Judge Cote explained her reasoning for denying Velissaris's motion to withdraw

his guilty plea in a 58-page Opinion and Order issued on April 10, 2023.  In rebutting his claim

of innocence, Judge Cote succinctly summarized the conduct to which Velissaris had pled in

Count One, supplemented by the evidence to which he pointed in his motion:

> Looking at that evidence [i.e., the evidence to which Velissaris pointed]
> and at the statements made at his plea allocution (which have not been
> contested here), the following picture emerges.  Infinity Q represented to
> investors that, in general, it retained the right to adjust valuations
> produced by its use of pricing services to align the valuations more
> closely with fair market value.  Velissaris identified BVAL [Bloomberg
> Valuation Service] as the specific pricing service he would use as an
> independent source of valuation.
>
> Contrary to his representations, Velissaris altered BVAL's valuations of
> certain OTC [over-the-counter] derivative positions.  And, the alterations
> Velissaris made were not intended to align the valuations more closely
> with fair market value.  Instead, they were made to increase the Funds'
> NAV [Net Asset Value] and to defraud.  Thus, Velissaris made
> misleading misrepresentations about Infinity Q's use of BVAL and
> mismarked the value of the positions that he altered.  He has not now put

> forth evidence of innocence to weigh in his favor on his motion to withdraw his plea of guilty.

(ECF 39-2 at 52–53; footnote omitted.)[2]

The United States Court of Appeals for the Second Circuit affirmed his conviction and sentence, including the denial of his motion to withdraw his guilty plea. United States v. Velissaris, 23-6379, 2024 WL 4502001 (2d Cir. Oct. 16, 2024) (summary order.)

On December 2, 2025, Velissaris filed a motion to vacate, set aside, or correct the sentence imposed on him pursuant to 28 U.S.C. § 2255. Velissaris v. United States, 25-cv-10059 (DLC). He asserts ineffective assistance of counsel at the district court level, as well as various other grounds including asserted Brady violations, impingement upon his Fifth Amendment right against self-incrimination, use of "tainted" evidence from the SEC investigation and the government's use of flawed expert opinions. Briefing on the motion in the criminal case is underway.

DISCUSSION

A. The Standards for Summary Judgment

The liability portion of the SEC's motion is premised principally on the judgment of conviction, the sworn statements made at the plea allocution and a limited universe of documentary evidence.

Under Rule 56(a), Fed. R. Civ. P., summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment bears the burden of demonstrating there is no genuine dispute of material fact. Jeffreys v. City of New York, 426

---

[2] Judge Cote's statement is included only to the extent that it explains the words spoken in his plea allocution.

F.3d 549, 553 (2d Cir. 2005). A fact is "material" when it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). There is a genuine issue of fact if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A summary judgment movant is required to submit a statement of the material facts not in dispute. Local Civil Rule 56.1. "Each statement by the movant or opponent under Rule 56.1(a) and (b), including each statement denying and controverting any statement of material fact, must be followed by citation to evidence that would be admissible and set forth as required by Fed. R. Civ. P. 56(c)." Local Civil Rule 56.1(d). If a statement does not reference evidence or references evidence that is not admissible under Rule 56(c), then the statement may be disregarded by the Court. Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001). A district court is permitted but not required to consider evidence not pointed out in the Local Rule 56.1 statements. See Rule 56(c)(3); see also Holtz, 258 F.3d at 73; McGowan v. Stanley, 23-7769-cv, 2024 WL 5038633, at *2 (2d Cir. Dec. 9, 2024) (summary order). Velissaris, despite having been served with the requisite notice to a pro se litigant pursuant to Local Rule 56.2, did not submit a response or counter-statement to the SEC's Rule 56.1 statement. The statements in the SEC's Rule 56.1 submission are deemed admitted but only to the extent that the SEC's statement is supported by admissible evidence.

B. Standards For Issue Preclusion and Use of a Plea Allocution

Issue preclusion "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." Taylor v. Sturgell, 553 U.S. 880, 892 (2008) (quoting New Hampshire v. Maine, 532 U.S. 742, 748–749 (2001)). In a civil case, it is

appropriate to estop a party from relitigating issues actually and necessarily decided as part of a prior criminal judgment and conviction, in part because "[t]he government bears a higher burden of proof in the criminal than in the civil context." Gelb v. Royal Globe Ins. Co., 798 F.2d 38, 43 (2d Cir. 1986) (citing United States v. Podell, 572 F.2d 31, 35 (2d Cir. 1978)). "Perhaps the most attractive cases that have extended issue preclusion from criminal convictions to civil actions involve claims by the government for civil remedies based on the same transaction that gave rise to the conviction." 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4474 (2d ed.). For estoppel purposes, there is no difference between a conviction obtained by a plea or by a guilty verdict. Podell, 572 F.2d at 35.

The doctrine applies when the following four elements are satisfied: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 400 (2d Cir. 2011) (quotation marks omitted) (quoting Bank of New York v. First Millennium, Inc., 607 F.3d 905, 918 (2d Cir. 2010)); see also Interoceanica Corp. v. Sound Pilots, Inc., 107 F.3d 86, 91 (2d Cir. 1997). The burden of proof rests with the SEC, the party seeking preclusion, on all elements of the preclusion standard except the full and fair opportunity to litigate the issue, on which Velissaris, the party opposing preclusion, bears the burden of proof. Proctor v. LeClaire, 715 F.3d 402, 414 (2d Cir. 2013) (citing Kulak v. City of New York, 88 F.3d 63, 72 (2d Cir. 1996)). In deciding whether to apply issue preclusion, the second court does not sit in review of the first court's work. "The fact that the [prior tribunal] may have erred . . . does not prevent preclusion." B & B Hardware, Inc. v. Hargis Indus., Inc., 575 U.S. 138, 157 (2015).

Issue preclusion may be decided on a summary judgment motion because it often turns on the application of legal principles to undisputed facts. See Phoenix Light SF Ltd. v. Bank of New York Mellon, 66 F.4th 365, 369 (2d Cir. 2023). Although Velissaris disputes the facts underlying his conviction, there is no genuine dispute before this Court as to the fact of conviction on Count One of the Indictment, the content of his sworn plea allocution or the filings in the criminal proceeding and the content of the SEC filings submitted by the movant.

Separate from the conviction itself, the admissions in a plea allocution may itself support summary judgment. "A criminal defendant's self-inculpatory statements made under oath at his plea allocution 'carry a strong presumption of verity,' . . . and are generally treated as conclusive in the face of the defendant's later attempt to contradict them." Adames v. United States, 171 F.3d 728, 732 (2d Cir. 1999). Sworn admissions at a hearing in open court may support a grant of summary judgment under the federal securities laws. See S.E.C. v. Illarramendi, 732 F. App'x 10, 13 (2d Cir. 2018) (summary order) (citing Moll v. Telesector Resources Group, Inc., 760 F.3d 198, 205 (2d Cir. 2014) (". . . factual issues that a party creates by filing an affidavit crafted to oppose a summary judgment motion that contradicts that party's prior testimony are not 'genuine' issues for trial.")).

C. Velissaris Had a Full and Fair Opportunity to Litigate
   The Criminal Case and His Admissions Were Knowing and Voluntary

Velissaris was defended through his guilty plea by lawyers of the firm Arnold & Porter Kaye Scholer LLP. Before moving to withdraw his guilty plea, the first set of lawyers were substituted by lawyers at the firm Barnes & Thornburg LLP. Throughout the criminal proceedings, Judge Cote afforded Velissaris all rights to which a defendant is entitled under the Constitution and laws of the United States. He was released on bail during the pretrial phase of

the case with liberal travel restrictions.  His trial date was set nine months in advance.  His change of plea proceeding was set for seven days before the scheduled start of trial.

Four months after his guilty plea, Velissaris, represented by his new lawyers, moved to withdraw his guilty plea.  The motion was thoroughly considered and addressed by Judge Cote in a lengthy opinion.  The Second Circuit reviewed the district court's decision denying the motion to withdraw the plea, "finding no merit to Velissaris's legal innocence theory" and concluding "that the district court acted well within its discretion when it denied Velissaris's motion to withdraw his guilty plea."  (ECF 39-9 at 3.)

The Court has examined Velissaris's new, as well as his rehashed, arguments and finds that he has not met his burden to show that the criminal proceeding did not afford him a full and fair opportunity to defend.  The arguments advanced in his section 2255 motion are pending before another judge of this Court and are not considered on this motion.

His statements under oath at his plea allocution were knowing and voluntary.  He confirmed that he was 38 years old, held a Master's degree,[3] and was being treated for depression and PTSD but had never been hospitalized for those conditions and was not taking prescribed medications for those conditions.  (ECF 39-4 at 3–4.)  He was asked to tell the Court in his own words what he did that makes him believe he is guilty of the crime charged in Count One.  (Id. at 12.)  He confirmed that he took "care to make sure that every statement [was] accurate."  (Id. at 13.)  He read his statement.  (Id.)  In response to follow-up questions by Judge Cote, he confirmed that when he did what he had described he understood that it was wrong and in violation of the law.  (Id. at 14.)

---

[3] In his declaration, Velissaris states that he received a bachelor's degree in economics from Harvard University and a master's degree from Columbia University, Fu School of Engineering, in Operations Research.  (ECF 44 at 1.)

D. The Findings and Conclusions in the Criminal
   Proceeding Are Final in the Context of Issue Preclusion.

Issue preclusion requires "a valid and final judgment on the merits." Republic of Ecuador, 638 F.3d at 400. Here, a final judgment of conviction was entered in the district court and affirmed on appeal. The filing of a section 2255 motion, a collateral attack, does not undermine the finality of Velissaris's conviction. See Illarramendi, 732 F. App'x at 12 ("[B]ecause 'the pendency of an appeal from a conviction does not deprive a judgment of its preclusive effect,' . . . the same conclusion necessarily applies to a collateral challenge after affirmance of the conviction on appeal." (quoting United States v. 303 W. 116th St., New York, N.Y., 901 F.2d 288, 292 (2d Cir. 1990))).

In the event his conviction is set aside on the basis of the pending section 2255 motion, he will have the opportunity to move to set aside any judgment in this action under Rule 60(b), Fed. R. Civ. P.

E. The Allocuted Facts Were "Actually" and "Necessarily"
   Decided in the Criminal Prosecution.

As noted, the second required element for the application of issue preclusion is that "the issue was actually litigated and decided in the previous proceeding" and the fourth required element is that "the resolution of the issue was necessary to support a valid and final judgment on the merits." Republic of Ecuador, 638 F.3d at 400. The "actually and necessarily determined" issues are often discussed in tandem, see, e.g., Montana v. United States, 440 U.S. 147, 153 (1979), though they capture different concepts. An issue that was actually litigated but not decided ought not have preclusive effect because it lacks the benefit of the first fact finder's deliberation and judgment. 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4420 (3d ed. 2021). Likewise, a finding that was "merely

10

incidental" to the first fact finder's decision is not accorded preclusive effect because it may not have received the same careful consideration as a necessary determination.  Id. § 4421.

A conviction upon a guilty plea supports a subsequent grant of issue preclusion. See S.E.C. v Genovese, 553 F. Supp. 3d 24, 42 (S.D.N.Y. 2021) (Koeltl, J.) (issue preclusion on multiple securities violations based upon a guilty plea to one count of securities fraud under section 10(b));  S.E.C. v. Mattera, 11-cv-8323 (PKC), 2013 WL 6485949, at *7–9 (S.D.N.Y. Dec. 9, 2013) (issue preclusion in civil enforcement action based upon guilty plea in criminal proceeding); Mishkin v. Ageloff, 299 F. Supp. 2d 249, 253–54 (S.D.N.Y. 2004) (Marrero, J.) (issue preclusion in subsequent section 10(b) securities fraud civil action based upon a guilty plea in a criminal case).

Because the criminal action was resolved on the basis of a guilty plea, this Court considers only facts that Velissaris actually admitted in his plea allocution as necessary for Judge Cote's acceptance of his guilty plea to the crime charged in Count One.  See, e.g., S.E.C. v McCaskey, 2001 WL 1029053 at *4 (S.D.N.Y. Sept. 6, 2001) (scope of issue preclusion was based on "allocuted facts").  But wrongdoing alleged in the 43 paragraphs of Count One that is not fairly encompassed within the plea allocution was not actually and necessarily decided in the criminal proceeding and may not form a basis for issue preclusion.  For example, Count One includes the allegation that Velissaris engaged in conduct intended to obstruct the SEC's investigation.  (ECF 39-1 at ¶ 38.)  The plea allocution does not touch upon such conduct. Often, the plea allocution will encompass the entirety of the allegations of the count of conviction.  That is not the case here.  To the extent that Count One of the Indictment sheds light on the meaning of the words used in the allocution and the identity of the securities law provisions to which defendant was pleading guilty, it is appropriately considered.

11

F. The Issues in the Prior Litigation Must be Substantially the Same

To meet the identity-of-issues element, "it is not necessary that the issues be exactly identical; it is sufficient that 'the issues presented in [the earlier litigation] are substantially the same as those presented by [the later] action.'" Zherka v. City of New York, 459 F. App'x 10, 13 (2d Cir. 2012) (brackets in original) (quoting ITT Corp. v. United States, 963 F.2d 561, 564 (2d Cir. 1992)). The Supreme Court requires the Court to determine: "first, whether the issues presented by this litigation are in substance the same as those resolved [in the first action]; second, whether controlling facts or legal principles have changed significantly since the [prior action]; and finally, whether other special circumstances warrant an exception to the normal rules of preclusion." Montana v. United States, 440 U.S. at 155. As to the second inquiry, the amended judgment in the criminal case was entered on August 3, 2023. (ECF 39-8.) The Court is unaware of any material changes in the controlling legal principles of the securities laws that pertain to this action. The third inquiry will be addressed below.

In determining whether the factual issues in the SEC civil enforcement action are substantially identical to those in the prior criminal case, the Court has compared the statements made by Velissaris at his plea allocution with the allegations of the SEC's Complaint.

G. The Application of Summary Judgment Standards to Specific Claims

With the foregoing principles in mind, the Court turns to the particular claims on which the SEC seeks summary judgment.

1. Section 10(b), Rule 10b-5 and section 17(a).

"To have violated Section 10(b) and Rule 10b–5, [defendant] must have: (1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities. . . .

12

Essentially the same elements are required under Section 17(a)(1)-(3) in connection with the offer or sale of a security, though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)." S.E.C. v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999).

"Courts in this Circuit 'have applied collateral estoppel in the securities fraud context because the elements necessary to establish civil liability under Section[s] 17(a) and 10(b) are identical to those necessary to establish criminal liability under Section 10(b).'" Genovese, 553 F. Supp. 3d at 41 (collecting cases) (quoting S.E.C. v. Haligiannis, 470 F. Supp. 2d 373, 382 (S.D.N.Y. 2007)); see also S.E.C. v. Namer, 97-cv-2085 (PKC), 2004 WL 2199471, at *3–4 (S.D.N.Y. Sept. 30, 2004), aff'd, 183 F. App'x 120 (2d Cir. 2006).

The Court comfortably concludes that the conviction on Count One of the Indictment charging a violation of section 10(b) and Rule 10b-5 premised on his statements made at his plea allocution preclude Velissaris from relitigating whether he violated section 10(b) of the Securities Exchange Act and Rule 10b-5, as well as section 17(a) of the Securities Act.

The Third Claim, the section 20(a) claim, is brought as an "alternative" (ECF 36 at 16 n.3) to the Second Claim. The Ninth and Tenth Claims allege that Velissaris aided and abetted violations of section 10(b), Rule 10b-5 and section 17(a). The Court need not reach those claims because it has found him to be a primary violator.

The Court will grant summary judgment on the First and Second Claims and deny summary judgment on the Third, Ninth and Tenth claims.

2.  The Investment Advisers Act

Section 206(1) & (2) Claims.  Section 206(1) of the Investment Advisers Act, 15 U.S.C. § 80b-6(1), makes it unlawful for an investment advisor to use the mails or instrumentalities of interstate commerce to employ a scheme to defraud a client.  15 U.S.C. § 80b-6(1).  Section 206(2) makes it unlawful for an investment adviser to "engage in any transaction . . . which operates as a fraud or deceit upon any client or prospective client." Id. § 80b-6(2).  Section 206(1) requires a finding of scienter while section 206(2) encompasses negligent acts for which reasonable foreseeability is a necessary element.  See S.E.C. v. Rashid, 96 F.4th 233, 240 (2d Cir. 2024); Dembski v. S.E.C., 726 F. App'x 841, 844 (2d Cir. 2018) (summary order).

The Court concludes that the issues Velissaris seeks to relitigate on the section 206(1) & (2) claims are identical in all material respects to those actually and necessarily decided in the criminal case.  First, Velissaris admitted in his plea allocution that he "managed" the funds and thus he is an "investment advisor" within the meaning of section 202(11).  "[People] who manage[] the funds of others for compensation are 'investment advisers' within the meaning of the statute." Abrahamson v. Fleschner, 568 F.2d 862, 870 (2d Cir. 1977).

He also admitted that he "made false statements of material fact to investors in the Infinity Q funds that [he] managed, and [he] did so knowingly, willfully, and with the intent to defraud" and did so over the phone and by email.  (ECF 39-4 at 13.)  His plea statement makes out the scienter element necessary for section 206(1) liability.  In the civil enforcement arena, "deliberate dishonesty" is not required for proving a violation of section 206(2),[4] but it has nevertheless been shown here.  Finally, Velissaris's statement that "I knew that if I disclosed

---

[4] Aaron v. S.E.C., 446 U.S. 680, 697 (1980).

14

what I was doing, investors might have decided to redeem their investments or maybe would not have made the investments in the first place" satisfies the foreseeability requirement of section 206(2) and the materiality requirement of both sections.

"Facts showing a violation of Section 17(a) or 10(b) by an investment adviser will also support a showing of a Section 206 violation." Haligiannis, 470 F. Supp. 2d at 383 (granting summary judgment on issue preclusion on section 206(1) & (2) violations).

Summary judgment will be granted to the SEC as to the Fourth Claim. The Court will deny summary judgment on the Twelfth Claim, the aiding and abetting theory relating to the identical 206(1) and (2) violations.

Section 206(4) and Rule 206(4)-8. The SEC seeks summary judgment on a primary violation of Rule 206(4)-8, implementing section 206(4). The rule provides as follows:

> It shall constitute a fraudulent, deceptive, or manipulative act, practice, or course of business . . . for any investment adviser to a pooled investment vehicle to:
>
> **(1)** Make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; or
>
> **(2)** Otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

17 C.F.R. § 275.206(4)-8. Velissaris admitted to managing the Mutual Fund and hence is an investment advisor. The Mutual Fund meets the definition of a pooled investment vehicle under the rule. 17 C.F.R. § 275.206(4)-8(b).

A primary violation is established by Velissaris's admission that he made "false statements" to Mutual Fund investors "with the intent to defraud" by informing them of the

15

"independent Bloomberg system to value the fund's over-the-counter derivatives" but not disclosing that "I was making manual adjustment in the system which increased the values . . . that were reported." (ECF 39-4 at 13; see ECF 39-10 at 31.)  The materiality is established because he admits that he "knew that if I disclosed what I was doing, investors might have decided to redeem their investments or maybe would not have made the investments in the first place." (ECF 39-4 at 13.)

The Court will grant summary judgment to the SEC on the Fifth Claim but deny summary judgment on the related aiding and abetting violation alleged in the Fourteenth Claim.

Section 207 Claims Related to the False Form ADV. The SEC seeks summary judgment on its section 207 claim that alleges that Velissaris willfully made untrue statements of material fact or omitted to state material facts required to be stated in a report required to be filed with the SEC, conduct that is violative of section 207 of the Investment Advisers Act.  15 U.S.C. § 80b-7.

Specifically, the SEC has come forward with the Form ADV filed with the SEC by Infinity Q Capital Management LLC in order to become a registered investment adviser, in which, according to the SEC, it falsely represented that "100%" of the Private Fund's assets were valued by a person who was not a "related person" of Infinity Q.  (ECF 39-11 at 26 and 33.)  The specific question was directed to "your last fiscal year."  The Form ADV was executed on March 31, 2021 and was not signed by Velissaris.  The period covered by Velissaris's plea allocution is between 2018 and February 2021 and thus covers the last fiscal year before the March 31, 2021 statement.  But the false statement was made on March 31, 2021, a period not covered by Velissaris's sworn admission.  (ECF 39-4 at 13 ("Between 2018 and February 2021 . . . I made false statements of material fact . . . .").)  The familiar rule that a variance in dates between an

16

indictment and the evidence at trial that does not affect a substantial right is inconsequential[5] has no application to issue preclusion or the binding impact of an admission.

The Court will deny summary judgment on the Sixth Claim (primary liability) and the Fifteenth Claim (aiding and abetting the filing of the false Form ADV).

Section 204(a) and Rule 204-2 Claims. The SEC alleges a primary violation by Infinity Q Capital Management LLC of section 204(a) and Rule 204-2. 15 U.S.C. § 80b-4; 17 C.F.R. § 275.204-2. The statute and rule require that records and reports be maintained by an investment adviser on, among other things, the "amount of assets under management" and the "valuation policies and practices of the fund." 15 U.S.C. § 80b-4(b)(3)(A) & (D). The SEC's Complaint alleges that the entity failed to maintain the required books and records and failed to furnish to the SEC copies of these books and records. (Complaint ¶ 282.) The Court cannot discern any evidence tendered by the SEC to support this claim. As purported evidence, it cites to a footnote in Judge Cote's Opinion denying Velissaris's motion to withdraw his guilty plea, which stated that "during the SEC's investigation of Velissaris, he provided the SEC with falsified minutes of meetings of the valuation committee to hide his fraudulent use of BVAL." (Opinion and Order of April 10, 2023, ECF 39-2 at 47 n.15.) No falsified minutes have been furnished nor any admissible evidence of their falsity. The quote in the Opinion is not a substitute for admissible evidence.

Summary judgment will be denied on the section 204(a) and Rule 204-2 claim, the Eleventh Claim.

Section 206(4) and Rule 206(4)-(7). The SEC seeks summary judgment on a theory of aiding and abetting a violation of section 206(4) of the Investment Advisers Act and a

---

[5] United States v. Heimann, 705 F.2d 662, 666 (2d Cir. 1983) ("Particularly with respect to allegations of time, we have permitted proof to vary from the indictment provided that the proof fell within the period charged.")

specific implementing rule, Rule 206(4)-(7).  15 U.S.C. § 80b-6(4); 17 C.F.R. § 275.206(4)-7.  It

asserts that Infinity Q Capital Management LLC failed to adopt and implement written policies

and procedures reasonably designed to prevent violation of the Investment Advisers Act, and that

Velissaris aided and abetted that violation.  The regulation requires the adoption of such policies

and procedures, annual review and the designation of a compliance officer.  17 C.F.R. §

275.206(4)-7.  As cited support for this claim, the SEC references its own Rule 56.1 Statement at

¶ 62 that "[t]he Compliance Manual does not address the ability of its personnel to access or

manipulate the inputs in BVAL without proper controls and monitoring," citing four pages of the

manual.  (ECF 39-12 at 80–83.)

But the Compliance Manual that has been submitted states in clear language as

follows:

> As a fiduciary, Infinity Q has an obligation to value the investments held
> by each client account in a manner that is fair, consistent and in the best
> interest of each client. Infinity Q calculates fees charged to clients and
> performance that it may use in presentations to clients and prospects
> based on the values of assets in client accounts.  An incorrect valuation
> of assets may result in overcharges of fees to clients and/or overstatement
> of performance information, which in each case may be a violation of the
> firm's fiduciary duty and the anti-fraud provisions of the Advisers Act.

(Id. at 81.)  It also speaks to adjustments to valuations by a third-party service:

> In circumstances where . . . [a] pricing service, quote or quotes may not
> provide a reliable indication of fair value, Infinity Q will value each such
> position based on relevant information, including, without limitation:
> (i) an internally or externally developed model, including inputs and
> assumptions (e.g., comparing market values for similar
> companies/instruments); and/or (ii) such other factors as may be deemed
> appropriate.

(Id. at 84.)  Unguided by testimony, expert or otherwise, it is not clear what additional

language in the Compliance Manual would have had the tendency to thwart or deter

the CEO and principal owner of the entity from surreptitiously manipulating the

18

valuation methodology to suit his criminal purposes.  The Court declines to engage in a form of DIY judging in which it evaluates the actual Compliance Manual against some unexpressed, idealized version of what it might have said.  Nor will it adopt a syllogism built on false premises.[6]

The Court will deny summary judgment on the section 206(4) and Rule 206(4)-7 claim, the Thirteenth Claim.

### 3. The Investment Company Act.

Section 34(b).  "The Investment Company Act of 1940 . . . regulates investment companies, including mutual funds."  Jones v. Harris Assocs. L.P., 559 U.S. 335, 338 (2010).  Section 34(b) prohibits the making of "any untrue statement of a material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to" the Investment Company Act or omitting "to state [in any such record] any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading."  15 U.S.C. § 80a-33(b).

The SEC's theory under section 34(b) proceeds from the premise that the Mutual Fund made untrue statements of material fact on Form N-CSR filed with the SEC that included the Mutual Fund's report to shareholders.  (ECF 39-10.)  Specifically, the Mutual Fund's Consolidated Statement of Assets and Liabilities for the fiscal year ending August 31, 2020, placed a value on the unrealized appreciation and depreciation of various types of swap contracts that are forms of OTC derivatives that are referenced in Count One of the Indictment.  (Compare

---

[6] The SEC states in conclusory fashion that "Infinity Q did not adopt and implement written policies and procedures reasonably designed to prevent violations" and Velissaris aided and abetted the failure to implement such policies and procedures.  (ECF 36 at 26).  The argument approximates the following false syllogism:
  1.  If a compliance manual is compliant with the SEC rule, it would prevent violations.
  2.  This Compliance Manual did not prevent violations.
  3.  Therefore, this Compliance Manual was not compliant with the SEC rule.

ECF 39-10 at 31, with ECF 39-1 at ¶ 14.) The time period covered by the Form N-CSR is within the period covered by Velissaris's plea allocution. Velissaris admitted that he managed the Funds and that he inflated the valuations of the Funds, including the Mutual Fund. He acknowledged that disclosure of the true valuation would have resulted in an increase in redemptions by investors or failure to invest in the first place, which makes the misstatements material and the substantial losses foreseeable.

The registrant listed on the Form N-CSR is the "Trust for Advised Portfolios" that did business as the Infinity Q Diversified Alpha Fund, the Mutual Fund. Velissaris was not the registrant, nor did he sign the Form N-CSR for the registrant. His name appears nowhere in the document. The record does not permit the finding of primary liability on his part. Summary judgment will be denied on the primary violator theory under section 34(b), the Seventh Claim for Relief.

But the Court concludes that summary judgment is appropriate on an aiding and abetting theory of liability. "In order for a defendant to be liable as an aider and abettor in a civil enforcement action, the SEC must prove: (1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation." Gonnella v. S.E.C., 954 F.3d 536, 550 (2d Cir. 2020) (quoting S.E.C. v. Apuzzo, 689 F.3d 204, 206 (2d Cir. 2012)).

A primary violation by the Mutual Fund is established by the falsity of the valuations. Velissaris admits that he managed the Mutual Fund and as a member of the Valuation Committee of the registered investment adviser he would know that valuations of the assets of the Mutual Fund were false and inflated and subject to a legal reporting requirement.

Velissaris substantially assisted the making of the false statements because it was his manipulation of valuations of OTC derivatives that made the financial statements false.

The Court will grant summary judgment on the Sixteenth Claim.

Section 37.  Section 37 of the Investment Company Act makes it unlawful for any person to steal, embezzle or unlawfully and willfully convert any money, funds or assets of any registered investment company.  15 U.S.C. § 80a-36.  The statute is a criminal statute with only criminal penalties.  There is no controlling authority that the SEC may bring an action under section 37.

The SEC cites to Brown v. Bullock, 194 F. Supp. 207 (S.D.N.Y. 1961), aff'd, 294 F.2d 415 (2d Cir. 1961) (Friendly, J.), in which the court held that an allegation that payments that were "excessive and out of proportion to the value of the services performed, as the defendants knew or should have known" stated a claim of an "unlawful and willful conversion" of the fund's money in violation of section 37.  Brown, 194 F. Supp. at 215.  The context for this holding was neither a civil enforcement action nor a criminal prosecution but a private suit by a derivative party seeking to recover the excessive compensation on behalf of the corporation.

Subsequent to Brown v. Bullock, Congress enacted section 36(b) that permitted both SEC enforcement actions and private actions for breach of fiduciary duty against an investment adviser relating to "compensation or payments."  15 U.S.C. § 80a-35(b).  See Krinsk v. Fund Asset Mgmt., Inc., 654 F. Supp. 1227, 1231 (S.D.N.Y. 1987), aff'd, 875 F.2d 404 (2d Cir. 1989).  "[T]o face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  Jones v. Harris Assocs. L.P., 559

21

U.S. 335, 346 (2010); see also Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923, 928 (2d Cir. 1982).

In this action, the SEC has failed to demonstrate that it has the right to bring a civil enforcement action under section 37, a criminal statute, and thereby avoid the strictures of section 36(b).[7]  Summary judgment on the section 37 claim, the Eighth Claim, will be denied.

Rule 22c-1.  The SEC asserts that Velissaris aided and abetted a violation by the Mutual Fund of Rule 22c-1, promulgated under the Investment Company Act.  17 C.F.R. § 270.22c-1.  The rule provides that:

> No registered investment company issuing any redeemable security . . . shall sell, redeem, or repurchase any such security except at a price based on the current net asset value of such security which is next computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security.

While the manipulation of the valuation of OTC derivatives undoubtedly affected the net asset value of shares of the Mutual Fund, the SEC has made no attempt to tie any particular redemption or group of redemptions to a manipulation of valuation of certain assets.  It cites one paragraph of its Rule 56.1 statement to support the claim.  The evidence cited in that paragraph (ECF 37 at ¶ 63) is an SEC summary of an application made to it by the registered investment adviser and the Mutual Fund seeking to suspend redemptions because "[b]ased on information learned by the Commission staff and shared with" the applicants, Velissaris "had been adjusting certain parameters within the third-party pricing model that affected the valuation of the Swaps." (ECF 39-13 at 3.)  Accordingly, "it would not be able to calculate a fair value for

---

[7] The Court acknowledges that one court has permitted the SEC to proceed under section 37.  S.E.C. v. Commonwealth Chemical Securities, Inc., 410 F. Supp. 1002, 1018 (S.D.N.Y. 1976) ("Although we have found no case in which the SEC brought suit to enforce this statute, we believe that the SEC may do so under its broad powers to compel compliance with the securities laws."), aff'd in part, modified in part, 574 F.2d 90 (2d Cir. 1978).  The Circuit's partial affirmance did not discuss the SEC's authority to assert such a claim.

any of the Swaps in sufficient time to calculate an accurate NAV for at least several days." (Id.) The SEC granted the application.

The evidence proffered by the SEC, specifically its summary of the application made to approve the suspension of redemptions, at best a secondhand statement made after Velissaris's misdeeds came to light, does not support summary judgment against Velissaris as a primary violator or as one substantially assisting a violation by the Mutual Fund. 15 U.S.C. § 80a-47(b).

Summary judgment will be denied on the Seventeenth Claim for Relief.

H.  There are No Equitable Considerations that Counsel
    Against the Use of Issue Preclusion Principles in This Action.

There is no controlling authority concluding that equitable considerations must be separately assessed where issue preclusion is invoked by the SEC following a parallel criminal proceeding, as would be the case in a dispute between private parties.[8]  Nevertheless, the Court has searched the record and concludes that it is not inequitable for the SEC to invoke the doctrine.

For example, there is no basis to conclude that the SEC avoided joining the first action for a strategic reason.  See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331 (1979) ("[I]n cases where a plaintiff could easily have joined in the earlier action . . . the application of offensive estoppel would be unfair to a defendant. . . .").  The first action was a criminal prosecution resulting from a grand jury indictment that the SEC was not authorized to pursue. Even at that, the SEC commenced its enforcement action on February 17, 2022, the date the criminal indictment was unsealed.

---

[8] "Even if a court concludes that all four prongs of the nonmutual offensive collateral estoppel analysis have been established, it must still assure itself that it is fair to apply the doctrine."  Bifolck v. Philip Morris USA Inc., 936 F.3d 74, 84 (2d Cir. 2019) (citing Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331 (1979)).

23

Nor was the first action one with low stakes and a small incentive to defend vigorously. Id. at 330. Velissaris had a powerful incentive to defend the criminal case that could and did result in a lengthy prison term and substantial forfeiture and restitution obligations. The burden of proof in a criminal case is higher than in a civil enforcement action and there are no procedural opportunities in this civil action that are "likely to cause a different result" from the criminal case. Id. at 332.[9] The outcome of the criminal action was not inconsistent with that of any other proceeding against Velissaris before or since. Id.

There is nothing inherently inequitable in the SEC seeking issue preclusion based on the outcome of a parallel criminal proceeding. The Court has reviewed the entirety of Velissaris's submissions and concludes that there is no reason sounding in equity to refrain from employing issue preclusion.

I.    Remedies and Relief

The SEC seeks a permanent injunction against Velissaris enjoining him from further violations of the statutory provisions for which the Court grants summary judgment, a bar on his serving as an officer or director of a public company, disgorgement in the amount of $14,867,168 and prejudgment interest of $4,496,851 with "the Court deem[ing it] . . . satisfied by the $125,969,962.78 restitution order in the Criminal Case." (ECF 36 at 32.) In view of the 180-month prison term, the SEC is not seeking a civil penalty.

1.    A Permanent Injunction Against Future Violations

The finding of a violation of a provision of the securities laws does not necessitate the issuance of an injunction. The SEC must demonstrate a "substantial likelihood of future violations of illegal securities conduct." S.E.C. v. Cavanagh, 155 F.3d 129, 135 (2d Cir. 1998).

---

[9] While discovery in a civil action is broader, criminal prosecutions come with Brady and Giglio obligations on the part of prosecutors and the right of a defendant to receive witness statements under 18 U.S.C. § 3500.

"In determining whether there is a realistic likelihood that a defendant will violate the securities laws in the future, courts look to a number of factors: (1) the degree of scienter involved; (2) the isolated or persistent nature of the past fraudulent acts; (3) the defendant's appreciation of his wrongdoing; and (4) the defendant's opportunities to commit future violations." S.E.C. v. Opulentica, LLC, 479 F. Supp. 2d 319, 329 (S.D.N.Y. 2007) (Holwell, J.) (citing Cavanagh, 155 F.3d at 135).

Velissaris acted with an "intent to defraud" and knew what he was doing was wrong and unlawful. (ECF 39-4 at 13–14.) The violations were not a one-time occurrence but took place over a number of years from 2018 to 2021 and required sophistication, a high degree of skill and careful planning and implementation. At present, Velissaris does not express remorse or acceptance of responsibility for his actions. Velissaris unsuccessfully endeavored to withdraw his guilty plea and, in this action, claims innocence in a manner inconsistent with his plea allocution. See ECF 45 at 20 ("Mr. Velissaris is innocent of the claims raised against him by the SEC."); id. at 4 ("[T]he evidence shows that Mr. Velissaris disclosed the fact that Infinity Q was making manual updates to valuations on over one thousand occasions to investors . . . ."); id. at 17 ("Mr. Velissaris never stated the higher values were incorrect in his plea allocution. He simply stated the values subjectively used by Infinity Q were higher than Bloomberg's values."). Velissaris's relatively young age at the time of his expected release from imprisonment is a factor favoring the issuance of an injunction. According to the BOP Inmate Lookup, he is presently 41 and will be 50 at the time of his projected release.[10] He had extensive experience as an analyst or portfolio manager at three different firms in the securities markets before launching

---

[10] https://www.bop.gov/inmateloc/ (last accessed Mar. 14, 2026.)

25

Infinity Q. (ECF 45-6 at 15.) It is reasonable to expect that in the absence of an injunction, he would return to what he knows best—the securities markets.

The Court concludes that an injunction against future violations of section 17(a) of the Securities Act, section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder and sections 206(1) & (2) of the Investment Advisers Act is necessary, appropriate and sufficient.

2.  Injunction Against Serving as an Officer or Director of a Public Company.

The SEC seeks to permanently bar Velissaris from serving as an officer or director of a public company. The Court acknowledges its authority to "prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated [the antifraud provisions] from acting as an officer or director [of a public company] if the person's conduct demonstrates unfitness to serve as an officer or director." 15 U.S.C. §§ 77t(e), 78u(d)(2).

The Second Circuit has identified six non-exclusive factors relevant to the determination of whether to enter such a bar: "(1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." S.E.C. v. Bankosky, 716 F.3d 45, 48 (2d Cir. 2013) (quoting S.E.C. v. Patel, 61 F.3d 137, 141 (2d Cir. 1995)).

The underlying violations were egregious and show a high degree of planning and concealment. Velissaris has not been accused of criminal wrongdoing or securities fraud in any other circumstance insofar as the record reveals. He was CEO and Chief Investment Officer at

26

the time he engaged in the fraud. He gained financially from the fraud, as is demonstrated by the SEC's submission on disgorgement. The Court has already determined that there is a likelihood of recurrence of a securities law violation in the absence of an injunction. He has never served as an officer or director of a public company. He has served as an investment adviser and in that capacity lied to investors. But it ultimately seems unlikely that he would be given the opportunity to serve in a high position in a public company given the coverage of his crime in the Wall Street Journal, CNBC and other outlets. His crime is readily knowable with only a few keyboard strikes and mouse clicks and it seems highly unlikely that he would ever be hired by a public company. The Court declines to enter a bar to service as an officer or director of a public company.

### 3. Disgorgement.

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits." S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1474 (2d Cir. 1996). It "has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." Id. at 1474–75. However, "Courts may not enter disgorgement awards that exceed the gains 'made upon any business or investment, when both the receipts and payments are taken into the account.'" Liu v. S.E.C., 591 U.S. 71, 91 (2020). In other words, disgorgement is limited to net profits or gain.

The SEC has submitted the declaration of a "Senior Counsel" of the SEC who has calculated the proposed disgorgement as $14,867,168, plus prejudgment interest of $4,496,851. (ECF 38 at ¶ 3.) The proposed disgorgement amount is calculated as the "annual bonus, incentive bonus, and profit distributions from Infinity Q for each year between 2017-2021" with

27

a percentage deduction to bring the number to a reasonable estimation of the "excessive compensation" due to the scheme to defraud.  (Id. at ¶¶ 4, 12–15.)

While Velissaris disputes the losses to the Funds and whether the charged conduct caused those losses (e.g., ECF 45-1), he has not disputed the amount of the proposed disgorgement.  But that does not end the matter.  Here, the restitution obligation of $125,969,962.78 (ECF 39-8) has been affirmed on appeal.  (ECF 39-9 at 3–4.)  The SEC therefore further requests that "the Court deem Velissaris's disgorgement and prejudgment interest payment obligations satisfied by the $125,969,962.78 restitution order in the Criminal Case."  (ECF 36 at 32.)  In other words, the disgorgement amount would have no practical meaning.

In a very similar circumstance in an SEC enforcement action in which the restitution amount in the parallel criminal case dwarfed the disgorgement request, Judge Koeltl declined to award disgorgement under an order that would deem the disgorgement obligation satisfied by the restitution order, a remedy that would be "purely symbolic:"

> [I]f viewed in isolation of the defendant's criminal case, the SEC's request for disgorgement with prejudgment interest . . . could be warranted. However, disgorgement is an equitable remedy for compensating the victims of securities law violations through divesting a defendant of ill-gotten gains and is not intended to be purely symbolic. As the Supreme Court has made clear in Liu, disgorgement is authorized in SEC enforcement actions only to the extent that it "may be appropriate or necessary for the benefit of investors." Liu, 140 S. Ct. at 1947. Given the much larger restitution order in [the defendant's] parallel criminal case, and the SEC's request that any disgorgement award be deemed satisfied by that order, the SEC has failed to explain how a disgorgement award, which is otherwise deemed satisfied, is necessary or appropriate for the benefit of investors. Accordingly, the Court declines to enter the "deemed satisfied" order of disgorgement sought by the SEC.

28

S.E.C. v. Genovese, 553 F. Supp. 3d 24, 48–49.[11]  No explanation of the utility of such relief has been shown, despite years having passed since Judge Koeltl's ruling.  The Court declines to grant the "deemed satisfied" award of disgorgement.


CONCLUSION

The Court grants summary judgment in favor of the SEC and against Velissaris on the First, Second, Fourth, Fifth, and Sixteenth Claims and otherwise denies summary judgment.  The SEC shall submit a proposed judgment in fourteen days and Velissaris shall respond twenty-one days thereafter.

The Clerk is requested to terminate the motion at ECF 35.

SO ORDERED.

P. Kevin Castel
United States District Judge


Dated: New York, New York
       March 18, 2026

---

[11] But see S.E.C. v. Simeon, 21-cv-5266 (ARR) (LGD), 2026 WL 73973, at *9 (E.D.N.Y. Jan. 9, 2026) (granting a "deemed satisfied" award of disgorgement); S.E.C. v. Afriyie, 16-cv-2777 (JSR), 2018 WL 6991097, at *5 (S.D.N.Y. Nov. 26, 2018), aff'd, 788 F. App'x 59 (2d Cir. 2019) (same).